UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL D. WEYANT,                :
                                  :
        Plaintiff                 :    No. 1:13-CV-02602
                                  :
    vs.                           :    (Judge Kane)
                                  :
CAROLYN W. COLVIN, ACTING         :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
        Defendant                 :

<u>MEMORANDUM</u>

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michael D. Weyant's claim for social security disability insurance benefits and supplemental security income benefits.  For the reasons that follow, the Court will affirm the Commissioner's decision.

**I.    BACKGROUND**

On February 23, 2012, Weyant filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 12, 71, 166, 168-173 and 185.[2]  The applications were initially denied by the

_____

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on January 29, 2014.

Bureau of Disability Determination[3] on July 30, 2012. Tr. 12 and 89-93.  On August 24, 2012, Weyant requested a hearing before an administrative law judge ("ALJ") which was held on April 17, 2013. Tr. 12, 28-70 and 96-98.  Weyant was represented by counsel at the hearing.  Id.  Weyant alleged that he became disabled on January 23, 2008, because of bipolar disorder, major depressive disorder, anxiety disorder, chronic obstructive pulmonary disease,[4] severe headaches and daily vomiting of an unknown etiology.[5] Tr. 32, 72, 89, 189 and 245. Weyant further claimed that he was presumptively disabled under the Social Security Administration's Listings of Impairments set forth in the Code of Federal Regulations, specifically Listing 12.04, Affective Disorders, section A (1)(a)-(I), (2)(a)-(h) and (3) and section B.  Tr. 245-246.

The requirements of Listing 12.04 in relevant part are as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial

---

3.   The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 90.

4.   The administrative record reveals that Weyant smoked 3 packs of cigarettes per day for 25 years.  Tr. 446.  At the administrative hearing Weyant claimed he was down to 10 cigarettes per day but admitted that a month before the hearing he was smoking 3 packs per day.  Tr. 37.

5.   At the hearing counsel for Weyant indicated by referring to her brief that Weyant became disabled on January 23, 2008. Tr. 32. However, the record reveals two other alleged disability onset dates: February 2, 2010 and January 31, 2011. Tr. 72 and 166.

manic or depressive syndrome.  Mood refers to a
prolonged emotion that colors the whole psychic life;
it generally involves either depression or elation.
  The required level of severity for these disorders is
met when the requirements in both A and B are satisfied
. . .

A. Medically documented persistence, either continuous
or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four
of the following:

a. Anhedonia or pervasive loss of interest in almost
all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy;
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
I. Hallucinations, delusions or paranoid thinking;

or

2. Manic syndrome characterized by at least three of
the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractability; or
g. Involvement in activities that have a high
probability of painful consequences which are not
recognized; or
h. Hallucinations, delusions or paranoid thinking;

or


3.  Bipolar syndrome with a history of episodic periods
manifested by the full symptomatic picture of both
manic and depressive syndromes (currently characterized
by either or both syndromes);

AND

B. Resulting in at least two of the following:

3

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social
    functioning; or
    3. Marked difficulties in maintaining concentration,
    persistence or pace; or
    4. Repeated episodes of decompensation, each of
    extended duration[.]

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04.  Weyant claimed

that he met the requirements of section A (1)(a), (b), (c), (g)

and (I), (2)(a), (b), (c), (e), (g) and (h), and (3), and Section

B (2) and (3).

At the administrative hearing when asked what kept him from

working full time Weyant responded by stating as follows: "I wake

up every morning, throwing up, hacking, coughing. I pass out once

in a while, and I just don't go out of the house. I'm not lazy.

It's just sometimes I don't want to be around people." Tr. 39.  He

further testified that he had a history of not getting along with

others and losing his temper; he has memory problems characterized

by difficulty with reading comprehension; he has problems adapting

to changes in his work routine, but he is able to concentrate

while watching 30-minute television programs; and he does not

trust many people, but gets along with his "adoptive brother." Tr.

44-55.

A week prior to the administrative hearing Weyant voluntarily

checked himself into Philhaven, a mental health facility, located

in Mt. Gretna, Pennsylvania, because he was allegedly having

thoughts of self-harm but was discharged from that facility after

3 days. Tr. 41 and 514.  As of the date of the administrative

hearing, Weyant was living with his "adoptive brother" in New Cumberland, Pennsylvania. Tr. 35 and 49-50.

On February 24, 2012, the ALJ issued a decision denying Weyant's applications. Tr. 12-23.  As will be explained in more detail *infra* the ALJ found that Weyant failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations.  Id.  Instead the ALJ found that Weyant had the ability to perform a limited range of medium work (treated as light work by the vocational expert) from an exertional[6] and nonexertional standpoint and identified three job

---

6.  The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
>
> (continued...)

which Weyant could perform. Tr. 22 and 62-63. On July 23, 2013, Weyant filed a request for review with the Appeals Council and on September 4, 2013, the Appeals Council concluded that there was no basis upon which to grant Weyant's request for review. Tr. 1-3 and 8. Thus, the ALJ's decision stood as the final decision of the Commissioner.

Weyant then filed a complaint in this court on October 21, 2013. Supporting and opposing briefs were submitted and the appeal[7] became ripe for disposition on April 18, 2014, when Weyant filed a reply brief.

---

6.  (...continued)
        (c) *Medium work*.  Medium work involves lifting no more
        than 50 pounds at a time with frequent lifting or
        carrying of objects weighing up to 25 pounds.  If
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

        (d) *Heavy work*.  Heavy work involves lifting no more
        than 100 pounds at a time with frequent lifting or
        carrying of objects weighing up to 50 pounds. If
        someone can do heavy work, we determine that he or she
        can also do medium, light, and sedentary work.

        (e) *Very heavy work*.  Very heavy work involves lifting
        objects weighing more than 100 pounds at a time with
        frequent lifting or carrying of objects weighing 50
        pounds or more.  If someone can do very heavy work, we
        determine that he or she can also do heavy, medium,
        light and sedentary work.

20 C.F.R. § 404.1567.

7.  Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

Weyant was born in the United States on January 7, 1970, and at all times relevant to this matter was considered a "younger individual"[8] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 47 and 137.

Although Weyant withdrew from school after completing  the 10th grade, he subsequently obtained a General Equivalency Diploma (GED) in 2008 and can read, write, speak and understand the English language and perform basic mathematical functions such as counting change and handling a savings account.  Tr. 188-190, 200 and 304.  During his elementary and secondary schooling, Weyant attended regular education classes. Tr. 190.  Prior to and after obtaining a GED, Weyant did not complete "any type of specialized job training, trade or vocational school." Id.

Weyant has a history of alcohol abuse and criminal convictions, including for driving under the influence of alcohol and harassment. Tr. 429.  In 2007, Weyant was convicted in state court of simple assault and terroristic threats and received a sentence of 1 to 5 years imprisonment. Tr. 293 and 429. On January 23, 2008, Weyant was incarcerated at the State Correctional Institution (SCI) at Camp Hill. Tr. 293, 343 and 350. Weyant was transferred to SCI-Mahanoy on January 30, 2008, where he remained until he was paroled in February, 2010. Tr. 265, 339 and 429.  He

---

8.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Kutzer was 43 years of age. Tr. 33.

served a total of 3 years in both county and state facilities. Tr. 429.[9]

Weyant's work history covers 24 years and at least 25 different employers. Tr. 178, 180-184, 248-254 and 430. The records of the Social Security Administration reveal that Weyant had earnings in the years 1985 through 1993, 1995 through 2007 and 2010 through 2011. Tr. 178. Weyant's annual earnings range from a low of $423.45 in 1990 to a high of $16,248.50 in 2004. Id. After 2004, Weyant's annual earning never rose above $5300. Id. Weyant's total earnings during those 24 years were $89,949.20. Id.

Weyant testified at the administrative hearing that he worked as a lineman for a cable TV company for 12 years. Tr. 60. Weyant also reported that his employment included work as a security guard, general laborer, carpenter, roofer, and inspector of motorcycle parts. Tr. 206 and 248-254. Prior to going to prison in 2007, Weyant was working through two temporary employment agencies, Ruggieri Enterprises LLC and Labor Ready Northeast, Inc., as well as for a roofing company, Corles Roofing and Siding. Tr. 183 and 249. Weyant testified that in 2011 he worked for United Parcel Service unloading trucks and for Librandi Machine Shop, Inc., inspecting Harley-Davidson brake pedals. Tr. 34 and

---

9. The Social Security regulations provide that "[n]o monthly benefits will be paid to any individual for any month any part of which the individual is confined in a jail, prison, or other penal institution or correctional facility for conviction of a felony." 20 C.F.R. §404.468. A felony under this regulation is defined as "an offense punishable by death or imprisonment for a term exceeding one year." Id. In his application for supplemental security income benefits Weyant represented that he had not been convicted of a felony. Tr. 169.

248.   He last worked at a warehouse though a temporary employment agency, Berks & Beyond, in early 2012, for about one week. Tr. 33-34 and 175.

A vocational expert described Weyant's past relevant employment[10] as follows: (1) a packer described as unskilled, medium work, (2) a construction worker described as unskilled, heavy work, and (3) a lineman for a cable company described as skilled, medium work. Tr. 60.

Although at the administrative hearing Weyant claimed that he has been disabled and unable to work full-time since January 23, 2008, the record reveals that Weyant applied for and received unemployment compensation benefits during the 2nd, 3rd and 4th quarters of 2011 in the amounts of $5447.00, $2028.00, and $1183.00, respectively.[11] Tr. 176.

Weyant argues that (1) the ALJ erred by failing to give appropriate weight to the opinion of Stanley E. Schneider, Ed.D., a psychologist who evaluated him on behalf of he Bureau of Disability Determination, (2) the ALJ's residual functional capacity assessment and hypothetical question to the vocational expert did not reflect Weyant's difficulties with concentration,

---

10.   Past relevant employment in the present case means work performed by Weyant during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.   20 C.F.R. §§ 404.1560 and 404.1565.

11.   An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). Although receipt of workers' compensation benefits does not preclude an award of DIB or SSI, an ALJ may consider receipt of such benefits when judging a claimant's credibility.

persistence or pace, and (3) the ALJ erred at step 3 of the sequential evaluation process by finding that Weyant's impairment did not meet Listing 12.04.

## II.  STANDARD OF REVIEW

A trial court has plenary review of all legal issues decided by the Commissioner. Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007). The trial court's review of any findings of fact, however, is limited to whether those findings are supported by "substantial evidence." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  The substantial evidence standard is highly deferential, and is satisfied with "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)(internal citation omitted). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001). Substantial evidence "does not mean a large or considerable amount of evidence," but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quotation omitted). Substantial evidence exists only "in relationship to all the other evidence in the record," see Cotter v. Harris, 642 F.2d 700. 704 (3d Cir. 1981), and therefore a court reviewing the Commissioner's decision must scrutinize the record as a whole, including whether the Commissioner adequately developed the record. Shaw v. Chater, 21 F.3d 126, 131 (2d Cir. 2000).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or  mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant, first, is engaging in substantial gainful activity; second, has an impairment that is severe or a combination of impairments that is severe; third, has an impairment or combination of impairments that meets or equals the requirements of a listed impairment; fourth, has the residual functional capacity to return to his or her past work; and, if

11

not, fifth, whether he or she can perform other work in the national economy. Id. For the purposes of this determination, residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Titles 11 and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed.Reg. 34475 (July 2, 1996).  The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. § 404.1545; see Hartranft v. Apfel,181 F.3d 358, 359 n.1 (noting that residual functional capacity is "defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## III. DISCUSSION

The ALJ at step one of the sequential evaluation process found that Weyant had not engaged in any substantial gainful activity since January 23, 2008, the alleged onset date.  Tr. 14. The ALJ found that Weyant worked after the alleged onset date but that his earnings were not consistently above the substantial gainful activity level.[12] Id.

---

12.  Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.  The official website of the Social Security Administration reveals that in 2004 the amount was $1350 per month ($16200 per year)and periodically increased thereafter. Substantial Gainful Activity, http://www.ssa.gov/oact/ cola/sga.html(Last accessed October 30, 2014).

At step two of the sequential evaluation process, the ALJ found that Weyant had the following severe impairments: "[Chronic obstructive pulmonary disease], Bipolar Disorder, Anxiety Disorder, Personality Disorder, and headaches[.]" Id.

At step three of the sequential evaluation process the ALJ found that Weyant's impairments did not individually or in combination meet or equal a listed impairment. Id.  In so doing the ALJ reviewed, inter alia,  the mental health Listing 12.04, and found that Weyant had  moderate restrictions with activities of daily living and moderate difficulties with social functioning and concentration, persistence and pace, and no episodes of decompensation of an extended duration. Tr. 16.  The ALJ further indicated that his assessment of those factors was not a residual functional capacity assessment and was only with respect to the severity of the mental impairments at steps two and three of the sequential evaluation process and that his assessment of Weyant's residual functional capacity at step four of the sequential evaluation process would be more detailed and reflect Weyant's limitations in activities of daily living, social functioning and concentration, persistence and pace.

At step four of the sequential evaluation process the ALJ found that Weyant could not perform his past medium to heavy work as a packer, construction worker and lineman but that he had the residual functional capacity to perform less than the full range of medium work because he was limited to standing and walking up

13

to four hours in an eight hour workday and sitting up to eight hours; he required a sit or stand option at will; he was capable of frequent bending, stooping, kneeling, crouching and crawling; he had to avoid temperature extremes, humidity, and pulmonary irritants; he was limited to occupations involving only occasional changes to the routine work setting; he was limited to understanding, remembering and carrying out only simple work-related instruction and interacting with coworkers and supervisors on an occasional basis; and he was to have no interaction with the public. Tr. 17.  In setting this residual functional capacity, the ALJ considered Weyant's credibility, past work and his activities of daily living, the records of the treating medical and mental health providers, and the opinions of the state agency psychologists and physicians who evaluated Weyant. Tr. 18-21.  The ALJ also found that Weyant's statements concerning the intensity, persistence and limiting effects of his impairments were not credible to the extent that they were inconsistent with his ability to engage in the work as described above. Tr. 18.

Based on the above residual functional capacity and the testimony of a vocational expert, the ALJ found at step five of the sequential evaluation process that Weyant could perform unskilled, medium work as a bakery worker-conveyor line, machine tender-laminating, and assembler-electrical accessories, and that there were a significant number of such jobs in the local, state and national economies. Tr. 22.  The vocational expert testified

14

that these positions were in the unskilled category and consistent with the residual functional capacity set by the ALJ. Tr. 62-65.

The administrative record in this case is 623 pages in length, primarily consisting of vocational and mental health records.  The ALJ did an adequate job of reviewing Weyant's medical history and vocational background in his decision. Tr. 12-23.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.

Weyant does not challenge the ALJ's assessment of his physical impairments.  Weyant argues that the ALJ failed to give appropriate weight to the opinion of Dr. Schneider; the residual functional capacity assessment and hypothetical question to the vocational expert did not reflect Weyant's difficulties with concentration, persistence or pace; and the ALJ erred by failing to find that he met the criteria of Listing 12.04. The Court will discuss each argument in turn.

   A.   Opinion of Dr. Schneider

On May 24, 2012, Dr. Schneider performed a one-time consultative psychological evaluation of Weyant. Tr. 427-435. After conducting a clinical interview and mental status examination, Dr. Schneider's diagnostic assessment was that Weyant suffered from bipolar disorder, major depressive disorder, anxiety disorder and alcohol dependence, in full remission. Tr. 432-433. The mental status examination revealed that Weyant had no unusual

mannerisms or behaviors; he was weepy throughout the assessment; his speech was somewhat fast but relevant, oriented and goal directed; his mood and affect were depressed; there was no evidence of perceptual disturbance; his stream of thought reflected a fast rate; he had no language impairment; he denied phobias and suicidal or homicidal ideation; he seemed somewhat aware of what was happening in the world; he was able to identify the President but not the current Governor; he was able to interpret simple proverbs; he was oriented to person, place and time; he reported short term memory problems; his attention and concentration were adequate; he reported being verbally impulsive with hostile and aggressive content; and his judgment was acceptable and insight good. Tr. 431-432. Dr. Schneider reported that Weyant's prognosis was guarded but Weyant did not appear that he was appropriately medicated for his depressive disorder. Tr. 433. Dr. Schneider also stated that Weyant was capable of managing his own funds and that Weyant did not identify any major impairments, restrictions or limitations in his activities of daily living. Id. Weyant stated that he was a loner and preferred it that way but that he lived with a woman whom he did not trust. Id. Weyant stated that his concentration and persistence vary but that his pace, when he does do things, is "fast." Id.

In a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" Dr. Schneider opined that Weyant had a slight to moderate limitation in his ability to understand and

16

remember short, simple instructions; a slight limitation in his

ability to carry out short, simple instructions; a moderate

limitation in his ability to understand, remember and carry out

detailed instructions; a slight limitation in his ability to make

judgments on simple home-related[13] decisions; a moderate

limitation in his ability to interact appropriately with

supervisors and coworkers; a marked limitation in his ability to

interact appropriately with the public and respond appropriately

to changes in a routine work setting; and an extreme limitation in

his ability to respond appropriately to work pressures in a usual

work setting.[14] Tr. 434.

Weyant contends that the ALJ should have accepted Dr.

Schneider's opinion in total. He claims that the moderate, marked

and extreme limitations preclude him from performing the mental

requirements of any type of full-time work.  The ALJ, however, did

---

13.  On the form Dr. Schneider drew a line through the word
"work" and inserted the word "home." Tr. 434.

14.  These medical sources statement generally have a cover page
defining the terms slight, moderate, marked, and extreme.  The
cover sheet was not included in the administrative record. In a
case where that cover sheet was submitted "moderate" was defined
as follows:  "There is a moderate limitation in this area, but
the individual is still able to function satisfactorily." See
Aucker v. Colvin, Civil No. 13-2019, (M.D. Pa. filed July 26,
2013), Doc. 12, p. 254. In the same document "marked" was defined
in part as "[t]he ability to function is severely limited but not
precluded" and "extreme" was defined as "[t]here is no useful
ability to function in this area." Id.  Our research did not
reveal a rule or regulation defining these terms as used in the
medical source statement. There is, however, a standard
definition for the term "moderate" as utilized in the Psychiatric
Review Technique form and at step three of the sequential
evaluation process which will be elaborated on subsequently.

not reject Dr. Schneider's opinion in its entirety. Instead he imposed some work limitations which were in accord with Dr. Schneider's opinion.  The ALJ determined that Weyant had the residual functional capacity to perform less than the full range of medium work, including limiting him to jobs involving only occasional changes to the routine work setting, understanding, remembering, and carrying out simple, work-related instructions, interacting on only an occasional basis with coworkers and supervisors and no interaction with the public.  Consequently, the residual functional capacity is consistent with Dr. Schneider's opinion that Weyant had marked impairment in his ability to interact appropriately with the public because it provides that Weyant should have no interaction with the public.  The limitation set by the ALJ that Weyant only have occasional interaction with coworkers and supervisors is consistent with Dr. Schneider's opinion that Weyant had moderate limitation in that area. Furthermore, the limitation set by the ALJ that Weyant be limited to simple work and not engage in detailed tasks is consistent with Dr. Schneider's opinion that Weyant had a moderate restriction in his ability to understand, remember and carry out detailed or complicated tasks.

     To the extent that the ALJ rejected Dr. Schneider's opinion that Weyant has some marked and extreme mental limitations, the ALJ adequately explained that those limitations were not supported by the treating source records and clinical examination findings

on a longitudinal basis. Tr. 21.  The ALJ did note that there were some Global Assessment of Functioning (GAF) scores between 30 and 50 but also scores between 60 and 70 and accepted those higher scores as more in accord with the treatment records and clinical examination findings.[15] Id.  The courts review of the administrative record supports the ALJ's determination.

The low GAF scores are from evaluations completed when Weyant received inpatient psychiatric treatment at Philhaven in April,

---

15.  The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

2013, for three days[16] and from treatment records of Yury
Yaroslavsky, M.D., a psychiatrist who examined Weyant on April 20,
May 18 and June 22, 2011. Tr. 379-384.  The mental status
examination performed by Dr. Yaroslavsky of Weyant on April 20,
2011, revealed that Weyant was pleasant and cooperative; he was in
some distress, ruminating about his current condition and
stressors, and slightly agitated; his mood and affect appeared
mostly anxious; he exhibited no impulse control problems; he
appeared quite dysphoric on a few occasions;[17] he exhibited no
evidence of psychosis; he denied suicidal and homicidal ideations;
his insight and judgment seemed to be limited to fair; he was
alert and oriented to person, place and time; he was well
organized; his thought process was linear; and his speech fluent
and coherent and he exhibited no abnormal movements. Tr. 383.  The
results of the mental status examinations of Weyant performed in
May and June by Dr. Yaroslavsky were similar.  Tr. 379 and 381.
Furthermore, in June Dr. Yaroslavsky reported that Weyant although
still looking dysphoric and anxious "actually looked calmer." Tr.
379.

     As for Weyant's 3-day stay at Philhaven at the time of
discharge from that facility, it was reported by Thomas L.
Fenstermacher, M.D., a staff psychiatrist, that Weyant at the time

---

16.  When Weyant was admitted to Philhaven he was given a GAF
score of 30 and a score of 40 when he was discharged. Tr. 514.

17.  Dysphoria is defined as "disquiet; restlessness; malaise."
Dorland's Illustrated Medical Dictionary, 579 (32nd Ed. 2012).

of discharge "was calmer and [Weyant] described his mood as 'okay'". Tr. 515. Furthermore, Weyant denied suicidal or homicidal ideations and contracted for safety; he exhibited no evidence of psychosis or mania; and he was able to speak calmly with his treatment team and expressed a desire to be discharged. Tr. 516-517.

The psychiatric evaluations and progress notes from the time Weyant was incarcerated (from sometime in late 2007 to early February, 2010) reveal that he was consistently given GAF scores of 64 or above representing mild symptoms and had normal mental status examination findings.[18] Tr. 265, 267-271, 274-278, 281, 283, 291, 296-298, 301 and 303.  A psychiatric evaluation performed at SCI-Camp Hill and two psychiatric progress notes are representative of this period of time. On December 12, 2007, Weyant was found to be alert; he was oriented to person, place, time; his motor activity was within normal limits; his affect was appropriate; his mood was euthymic;[19] he had no delusions or hallucinations; his memory, insight, judgment, attention, concentration were all intact; his intelligence was rated as average; and his fund of knowledge was adequate. Tr. 296-297.

---

18.  The Court's review of the record revealed at least 11 psychiatric progress notes.

19.  Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary, 8th edition, 2009. http://medical-dictionary.thefreedictionary.com/euthymic (Last accessed October 30, 2014).

Weyant was given a GAF score of 65-70. Id. On January 8, 2008, a
psychologist at SCI-Camp Hill found that Weyant's affect was
appropriate; his mood was euthymic; his attention and
concentration were intact; and he had no suicidal or homicidal
ideations. Tr. 303. The psychologist gave Weyant a GAF score of
70. Id. On January 28, 2010, Weyant reported he was "doing fine"
and he was "calm, cooperative, friendly [and] pleasant." Tr. 265.
A mental status examination revealed he was oriented to person,
place and time; his mood was euthymic; his affect was appropriate;
his thought processes were logical and coherent; he had no
auditory or visual hallucination or delusions; he had no mood
swings; he had no suicidal or homicidal ideations; and his
judgment and insight were intact. Id. He was given a GAF score of
65. Tr. 265.

     In rejecting Dr. Schneider's opinion in part, the ALJ also
relied on the opinion of Thomas Fink, Ph.D., a psychologist who
reviewed Weyant's medical records on July 5, 2012, and concluded
that Weyant was not as limited as Dr. Schneider opined. Tr. 79-81.
Dr. Fink concluded that Weyant was not significantly limited in
his ability to carry out very short simple instructions; perform
activities within a schedule, maintain regular attendance, and be
punctual within customary tolerances; work in coordination with or
in proximity to others without being distracted by them; make
simple work-related decisions; complete a normal workday and
workweek without interruptions from psychologically based symptoms

22

and to perform at a consistent pace without an unreasonable number
and length of rest periods; ask simple questions or request
assistance; accept instructions and respond appropriately to
criticism from supervisors; get along with coworkers or peers
without distracting them or exhibiting behavioral extremes; and
maintain socially appropriate behavior and adhere to basic
standards of neatness and cleanliness. Tr. 80-81.  Dr. Fink
further found that Weyant was moderately limited in his ability to
carry out detailed instructions, maintain attention and
concentration for extended periods, and interact appropriately
with the general public. Id.  Dr. Fink opined that Weyant "can
understand and follow simple instructions and maintain pace and
persistence on simple and some detailed tasks" and "is able to
communicate well, relate to others as motivated and interact in
the community." Id.  With respect to Dr. Schneider's opinion, Dr.
Fink stated that it was "not consistent with [Dr. Schneider's] own
observations in the body of [his] report or other sources[.]" Tr.
81.

Although Dr. Schneider found that Weyant had some moderate,
marked and extreme mental limitations, he did not indicate that
Weyant was functionally impaired from a mental standpoint for the
requisite continuous 12 months.[20]  Furthermore, the ALJ, not the

---

20.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
                                              (continued...)

treating or examining physician, makes the residual functional capacity and disability determinations. 20 C.F.R. §§ 404.1527(d)(1)-(2) and 416.927(d)(1)-(2). The weight afforded to any medical opinion is dependent on a number of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c)(3)-(4) and 416.927(c)(3)-(4). The ALJ is the one who determines what weight to assign medical opinion by considering the opinion's supportability and its consistency with the entire record. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). Moreover, Dr. Schneider was not a treating source and his opinion is of less weight than the opinions, particularly the GAF scores assessed and the mental status findings found by the treating psychiatrists during the time Weyant was incarcerated. Accordingly, the court is satisfied that there is substantial evidence supporting the ALJ's determination to reject Dr. Schneider's assessment of marked and extreme mental work-related limitations.

**B. Difficulties with concentration, persistence or pace**

As part of the step three analysis the ALJ found that Weyant had moderate difficulties with concentration, persistence and pace. However, when presenting a hypothetical question to the vocational expert, the ALJ did not include a moderate limitation in concentration, persistence and pace. Courts in this circuit

---

20. (...continued)
which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

and other circuits have held that if an ALJ poses a hypothetical question to a vocational expert that fails to reflect all of the applicant's impairments that are supported by the record, the vocational expert's opinion cannot be considered substantial evidence. Ramirez v. Barnhart, 373 F.3d 546, 552-553 (3d Cir. 2004);[21] O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010); Stewart v. Astrue, Civil No. 11-00978, 2012 WL 6538516, at *6 (M.D. Pa. 2012)(Caputo, J.); see also Corona v. Barnhart, 431 F.Supp.2d 506, 516 (E.D.Pa. 2006)("the ALJ's determination that Plaintiff suffers mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration is not properly reflected in her hypothetical question to the VE."); Warfle v. Astrue, Civil No. 10-1255, slip op. at 20 (M.D. Pa. May 5, 2011)(Muir, J.)("It is incumbent on the administrative law judge to include in a hypothetical question all the limitations that are supported by the records."); Little v. Astrue, Civil No. 10-1626, slip op. at 18-19 (M.D.Pa. September 14, 2011)(Kosik, J.)(same).

Weyant contends that the ALJ in phrasing a hypothetical question for the vocational expert did not sufficiently account

---

21. In Ramirez the Commissioner argued that the finding of a moderate limitation in concentration, persistence and pace at step three was not a residual functional capacity finding and was not applicable to steps four and five and need not be included in a hypothetical question to the vocation expert. The Court of Appeals rejected this argument stating that although the moderate limitation at step three was not the RFC assessment it did not follow that the finding played no role in steps four and five. 372 F.3d at 555.

for Weyant's moderate limitation in concentration, persistence and pace.  A residual functional capacity merely for unskilled or simple work may not account for moderate limitations in concentration, persistence or pace if those factors are not specifically delved into with the vocational expert. However, in the present case, in contrast to Ramirez, O'Connor-Spinner and Stewart and other cases from this district, the administrative law judge included in the residual functional capacity numerous other limitations beyond simple or unskilled work as previously enumerated herein.  This residual functional capacity was encompassed within the hypothetical question asked of the vocational expert. Tr. 61-62.

Another item of importance with respect to Weyant's second argument is the fact that Dr. Fink completed a mental functional capacity form (a Psychiatric Review Technique form) noting with respect to the severity of Weyant's mental impairments at step three of the sequential evaluation process that Weyant had moderate limitations in maintaining concentration, persistence and pace but he also went on and concluded in part III of the form (the mental residual functional capacity assessment) that Weyant was able to meet the basic mental demands of unskilled, simple routine jobs. Tr. 77 and 81.  With respect to that form, the Social Security Program Operation Manual System (POMS) defines "moderately limited" as "when the evidence supports the conclusion that the individual's capacity to perform the activity is

26

impaired" without specifying the degree of impairment and the degree of limitations/impairment has to be specified in Section III of the form.[22]  The ALJ adopted the assessment of Dr. Fink set forth in section III of that form, i.e., that Weyant could engage in competitive work on a sustained basis despite his limitations.[23] Tr. 323.  This fact is evidenced by the ALJ's statement in his decision that his assessment of those factors (including concentration, persistence and pace) was not a residual functional capacity assessment and was only with respect to the severity of the mental impairments at steps two and three of the sequential evaluation process and that his assessment of Weyant's residual functional capacity at step four of the sequential evaluation process would be more detailed and reflect Weyant's limitations in those areas. Consequently, the court is satisfied that the ALJ appropriately considered Weyant's moderate limitations in concentration, persistence and pace.

### C.   Listing 12.04, Affective Disorders

If Weyant's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits.  However, a claimant has the burden

---

22.  This definition was effective on October 14, 2010, and is applicable to this case.  There have been prior cases remanded in this district because of a failure to adequately address a limitation in concentration, persistence and pace with the vocational expert but this definition was not applicable to those cases.

23.  The ALJ, in fact, gave Weyant the benefit of the doubt and imposed restrictions greater than those found by Dr. Fink.

of proving that his or her severe impairment or impairments meet or equal a listed impairment.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d).  To do this a claimant must show that all of the criteria for a listing are met or equaled. Id.  An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.  Furthermore, the Commissioner's Listings contemplate that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one.  The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. §

404.1512©. Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

Weyant's argument is premised on the contention that he met the requirements of Listing 12.04, Affective Disorders.  The court has already addressed the criteria/requirements of that listing. In summary, Weyant had to establish, inter alia, that he had either two "marked" limitations in the categories of activities of daily living; maintaining social functioning; and concentration, persistence or pace; or one "marked" limitation coupled with repeated episodes of decompensation, each of an extended duration. See 20 C.F.R., Pt. 4040, Subpt. P, App. 1, §§ 12.04. No treating or examining psychologists or psychiatrist concluded that Weyant's impairments met those criteria, and was unable to engage in a limited range of unskilled, medium work.  In contrast Dr. Fink, a state agency psychologist, concluded that Weyant's mental conditions did not meet or equal the criteria of Listings 12.04 as well as 12.06 (Anxiety Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders) and was able to meet the basic mental demands of simple, unskilled work on a competitive basis. Tr. 77 and 81.  It was clearly appropriate for the ALJ to rely on Dr. Fink's opinion. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Weyant has proffered no medical opinion, nor has he marshaled the evidence in the record, to support his contention that his condition met the requirements of Listing 12.04. The ALJ gave an adequate explanation for finding that Weyant did not meet or equal the criteria of a listed impairment.  The court cannot conclude from the bare medical records that Weyant met the requirements of Listing 12.04.  The Court finds that the ALJ properly considered and rejected Weyant's claim that he met the requirements of Listing 12.04.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that there is substantial evidence to affirm the decision of the Commissioner of the Social Security Administration upholding the decision of the ALJ denying disability insurance benefits and supplemental security income payments to Weyant.  The Court will affirm the decision of the Commissioner.  An order consistent with this memorandum follows.